UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thomas Laviolette,

    Plaintiff,

    v.                                           Civil Action No. 2:16-cv-293

Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 8, 11)

Plaintiff Thomas Laviolette brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB). Pending before the Court are Laviolette's motion to reverse the Commissioner's decision (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 11). For the reasons stated below, Laviolette's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

Laviolette was 42 years old on his alleged disability onset date of June 8, 2012.[1] He completed high school and has work experience as a carpenter, a home health aide, a machinist, and a small business owner/oil burner technician. He is married and lives with his wife and grown sons.

---

[1] The record is unclear regarding whether the alleged disability onset date is June 7, or June 8, 2012. (*See, e.g.*, AR 22, 25, 34, 42, 133, 257, 279.) But the parties each refer to June 8 in their motions (*see* Doc. 8-1 at 1, Doc. 11-1 at 1, 3), and thus the Court does the same here.

In September 2006, Laviolette was injured at work. He has not worked full time ever since, mostly due to neck pain and decreased range of motion in his neck, but also because of pain in his shoulders, arm, and back; and pain radiating down his leg. To address his pain, Laviolette has undergone physical therapy, chiropractic treatment, acupuncture, epidural injections, nerve blocks, and radiofrequency ablation therapy, none of which has resulted in long-term relief. He has also been prescribed many different medications, including narcotics. In August 2012, after a cervical MRI showed degenerative changes at C6-7 in the cervical spine, a herniated disc, and foraminal stenosis; Laviolette underwent C6-7 anterior cervical discectomy and fusion surgery (neck surgery). (AR 388, 461–63.) The surgery reduced his right arm pain, at least temporarily, but his neck pain has continued. (AR 46–47.)

At the April 2016 administrative hearing, Laviolette testified that he is "on a ton of medication" (AR 48)—about 20 different kinds (AR 58)—and that those medications "help[] to a degree" (AR 48), but have the side effects of loss of balance, dizziness, and drowsiness (AR 58–59). (*See also,* regarding Laviolette's prescription drug use, AR 59, 410–11, 422–23, 434, 445, 476–80, 672, 745–50, 920, 1037, 1050–52.) Laviolette further testified that any activity or movement makes his pain severe (AR 49, 53), and that it is "not uncommon" for him to be in bed for three days at a time due to pain (AR 56). Laviolette's primary care physician, Dr. Melisa Gibson, stated in treatment notes from during and after the alleged disability period that she would need to taper Laviolette's medications at some point (*see, e.g.*, AR 416, 694, 1052), but Laviolette was never ready (*see, e.g.*, AR 434, 437, 1050). In an October 2015 treatment note, Dr. Gibson indicated that she was tapering Laviolette's medications

and that she had a "[l]ong and frank" discussion with Laviolette to advise him that, after almost nine years of treatment with pain medications and other modalities, "there is no indication to continue pain medication at such high doses when they have neither relieved pain [n]or restored function." (AR 1052.)

On July 16, 2014, Laviolette filed the pending DIB application, alleging that, starting in June 2012, he has been unable to work due to cervicalgia (neck pain), low back pain, chronic pain, depression, gastroesophageal reflux disease, hyperlipidemia, high blood pressure, insomnia, heart issues, and limited range of motion. (AR 116–18, 133, 261.) The application was denied initially and on reconsideration, and Laviolette timely requested an administrative hearing. The hearing was conducted on April 7, 2016 by Administrative Law Judge (ALJ) Matthew Levin. (AR 40–70.) Laviolette appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified at the hearing. On May 12, 2016, the ALJ issued a decision finding that Laviolette was not disabled under the Social Security Act at any time from his alleged disability onset date of June 8, 2012 through his date last insured of December 31, 2012. (AR 34.) Thereafter, the Appeals Council denied Laviolette's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–5.) Having exhausted his administrative remedies, Laviolette filed the Complaint in this action on November 2, 2016. (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in

"substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Laviolette had not engaged in substantial gainful activity since his alleged disability onset date of June 8, 2012. (AR 25.) At step two, the ALJ found that Laviolette had the severe impairment of degenerative disc disease of the spine with radiculopathy. (*Id.*) Conversely, the ALJ found that Laviolette's hypertension, hyperlipidemia, gastroesophageal reflux disease, coronary artery disease, adjustment disorder, depression, and anxiety disorder were nonsevere, given that none of these impairments created more than minimal limitations in Laviolette's ability to perform basic work tasks or mental work activities. (AR 25–27.) At step three, the ALJ found that none of Laviolette's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 27–28.)

Next, the ALJ determined that Laviolette had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), with the following particular limitations:

> [Laviolette] can frequently climb stairs but should avoid all ladders, ropes[,] and scaffolds. He is unlimited for balancing. [He] can frequently stoop, kneel, crouch, crawl, or use ramps. He can frequently perform overhead reaching [and] front and lateral reaching activities, and can frequently handle.

(AR 28.) Given this RFC, the ALJ found that Laviolette was unable to perform his past relevant work as a carpenter, a home health aide, a machine operator, and a small business owner/oil burner technician. (AR 32.) Finally, based on testimony from the VE, the ALJ determined that Laviolette could perform other jobs existing in significant numbers in the national economy, including the "light" jobs of price marker, furniture rental consultant, and laundry classifier (AR 33); and the "sedentary" jobs of telephone information clerk, final assembler, and call-out operator

5

(AR 34). The ALJ concluded that Laviolette had not been under a disability from the alleged onset date of June 8, 2012 through his date last insured of December 31, 2012. (AR 34.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more

6

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Laviolette argues that the ALJ erred in discounting the opinions of his treating primary care physician, Dr. Melisa Gibson, and in relying on the opinions of nonexamining agency consultants Francis Cook, MD and George Cross, III, MD instead. Specifically, Laviolette asserts that the ALJ did not give good reasons for giving little weight to Dr. Gibson's opinions, which Laviolette claims are consistent with Dr. Gibson's own medical records and with the rest of the record taken as a whole. (Doc. 8 at 4–6.) The Commissioner disagrees with Laviolette's claims, and contends the ALJ correctly found that Dr. Gibson's opinions did not apply to the relevant period and were unsupported by and inconsistent with the remainder of the record. (Doc. 11 at 4–8.)

The relevant opinions were made by Dr. Gibson in letters dated August 25, 2015 and April 6, 2016, respectively. (AR 908, 1129.) In the August 2015 letter, Dr. Gibson stated that, due to Laviolette's chronic neck pain and decreased range of motion in his neck and back, he had the following medical limitations: (1) he could not lift more than ten pounds; (2) he could not carry items "for any distance"; (3) he would likely have to change positions frequently to relieve pain and stiffness; (4) bending, stooping, and twisting would likely cause him pain; (5) climbing ladders or chairs could be dangerous

7

due to significantly reduced range of motion in his neck; and (6) repetitive use of his hands and reaching would likely exacerbate his neck pain. (AR 908.) Given these limitations, Dr. Gibson opined:

> I do not believe [Laviolette] could engage in full[-]time work at this point in time. He has been out of work since 2006 and has made minimal improvements in the symptoms that caused him to stop working in the first place. If anything, he now has additional limiting diagnoses such as thoracic and low back pain and depression.

(*Id.*) Dr. Gibson concluded that Laviolette's medical prognosis regarding pain control and return of function was "poor." (*Id.*)

Similarly, in her April 2016 letter, Dr. Gibson opined that Laviolette "is chronically disabled from chronic neck pain," which "severely limits his ability to move his head in all directions, lift his arms above chest level, lift[,] or carry." (AR 1129.) Dr. Gibson explained that Laviolette needed to lay down frequently, "which would prevent him from acquiring and sustaining meaningful work"; could not sit in one position; could not stand or walk for more than 10–15 minutes at a time; and had frequent exacerbations of pain, which "would require several days out of work per month (upwards of 5–7 days/month)." (*Id.*)

Given that Dr. Gibson is a physician who regularly treated Laviolette, she is considered a "treating physician" under the regulations; and thus the ALJ was required to evaluate her opinions under the "treating physician rule." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983); *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) ("A claimant's treating source is his or her own physician, . . . who has provided the [claimant] with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual."). That rule

8

mandates that an ALJ must give "controlling weight" to the opinions of a treating source if those opinions are "well[]supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). Here, although the ALJ explicitly recognized that Dr. Gibson was "a long[]time treating source of [Laviolette]" (AR 32), he gave Dr. Gibson's 2015 and 2016 opinions "little weight" (AR 31).

Where, as here, the ALJ does not afford controlling weight to the opinions of a treating source, the ALJ must consider various "factors" to determine how much weight to give the opinions. 20 C.F.R. § 404.1527(c). Among those factors are: the frequency of examination; the length, nature, and extent of the treatment relationship; the evidence in support of the opinions; the consistency of the opinions with the record as a whole; whether the treating source is a specialist in the area that is the subject of his or her opinions; and other factors tending to support or contradict the opinions. *Id.* The regulations also specify that the Commissioner "will always give good reasons" for the weight given to a treating source's opinions. *Id.* at § 404.1527(c)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503, 505 (2d Cir. 1998).

Here, the ALJ gave the following reasons in support of his decision to afford "little weight" to Dr. Gibson's opinions: (1) they were made in 2015 and 2016, more than two years after the expiration of Laviolette's date last insured, and they do not indicate how Laviolette's symptoms would have affected his functionality prior to that date; (2) they were offered "merely for the purpose of establishing disability"; (3) the

9

restrictions contained in the opinions are not corroborated by either Dr. Gibson's own treatment notes or the treatment notes of Laviolette's orthopedic physicians; and (4) the opinions are contradicted by the opinions of the nonexamining agency consultants. (AR 32.)

The ALJ considered the relevant factors—including particularly supportability and consistency with the record—in assessing the value of Dr. Gibson's opinions. (*See* AR 31–32.) The principal issue is whether the ALJ's findings regarding those factors were supported by "substantial evidence," which the Second Circuit defines as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). The Court finds that substantial evidence does in fact support the ALJ's findings, as discussed below.

First, the ALJ accurately pointed out that Dr. Gibson's opinions do not address the alleged disability period, June through December 2012. The opinions themselves were made approximately three years after that period ended; they are written almost entirely in the present tense; and they do not discuss the relevant period other than to state that Laviolette underwent neck surgery in 2012. (*See* AR 908, 1129.) Moreover, the August 2015 opinions are explicitly limited to "this point in time" (AR 908 ("I do not believe [Laviolette] could engage in full[-]time work *at this point in time*." (emphasis added))); and they indicate that Laviolette had developed "additional limiting diagnoses" in recent years (*id.*). Laviolette argues that Dr. Gibson's 2015 and 2016 opinions are essentially the same as her 2011 opinions, which are referenced in a prior ALJ decision. (Doc. 8 at 6 (citing AR 103).) But the 2011 opinions were not made

10

during the relevant period either, and there is evidence in the record to indicate that Laviolette may have been unable to work both in 2011 and in 2015–2016, but able to work during the relevant period in 2012. This is largely due to Laviolette's surgery in August 2012, which resulted in a lessening of Laviolette's arm and neck pain, at least temporarily. (*See* AR 47, 415, 418, 422–23, 453, 461–66.)[2]

The ALJ's next reason for giving limited weight to Dr. Gibson's opinions is because they were offered "merely for the purpose of establishing disability." (AR 32.) Laviolette argues that the ALJ should not have discounted Dr. Gibson's opinions on this ground, but the Court finds no error, especially given that this was only one of several reasons supporting the ALJ's analysis. Further, although it is not entirely clear, the ALJ's finding that Dr. Gibson's opinions are merely to establish disability appears to reference the fact that Dr. Gibson's opinions make a finding on the ultimate question of disability, stating that Laviolette carries diagnoses "that would preclude gainful employment" (AR 908), that Laviolette "could [not] engage in full[-]time work" (*id.*), and that Laviolette "is chronically disabled" (AR 1129). The ultimate issue of Laviolette's disability, however, is reserved to the Commissioner, as the regulations provide that "[a] statement by a medical source that [the claimant is] 'disabled' or

---

[2] Worth noting, but not critical to the decision, although Laviolette argues that "[t]here is no indication anywhere in the record of dishonesty, malingering, drug-seeking, or anything else that might lend credence to a conclusion that Dr. Gibson's opinions are tainted because Mr. Laviolette is seeking public benefits" (Doc. 8 at 7), there is in fact ample evidence in the record indicating that Laviolette engaged in drug-seeking behavior and overuse of his prescription medication (including narcotics) during the alleged disability period and thereafter. (*See* AR 415, 418, 453, 653, 676, 725, 727, 740, 973, 1050 (May 2015 treatment note from Dr. Gibson, stating, "[f]eels morphine doesn't work, thinks needs higher dose of oxycodone," "[w]as supposed to be off pain meds after neck surgery but never happened"), 1052 (October 2015 treatment note from Dr. Gibson, stating, "there is no indication to continue pain medication at such high doses when they have neither relieved pain or restored function").)

11

'unable to work,'" 20 C.F.R. § 404.1527(d)(1), is not a medical opinion but an "opinion[] on [an] issue[] reserved to the Commissioner because [it is an] administrative finding[] that [is] dispositive of [the] case; i.e., that would direct the determination or decision of disability," *id.* at § 404.1527(d). *See Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (holding doctor's opinion that claimant was "temporarily totally disabled" was entitled to no weight, "since the ultimate issue of disability is reserved for the Commissioner"); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance[, as g]iving controlling weight to such opinions would . . . confer upon the treating source the authority to make the . . . decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled").

The third—and most important—rationale given by the ALJ for discounting Dr. Gibson's opinions is that they are unsupported by both Dr. Gibson's own treatment notes and the treatment notes of Laviolette's treating orthopedic physicians. After reviewing the record, the Court agrees that treatment notes from the relevant period, including those of Dr. Gibson herself, do not support the extreme limitations contained in Dr. Gibson's 2015 and 2016 opinions. The ALJ accurately stated: "Although [Laviolette] sustained a serious neck injury [at work in 2006], which years later required [neck] surgery, the medical evidence reflects his recovery went 'fairly well,' with relatively few findings during the period from the alleged onset date through the . . . date last insured." (AR 30 (citation omitted); *see* AR 937.) Specifically,

12

following neck surgery in August 2012, although Laviolette was still having "some neck pain and periscapular spasm," as well as "intermittent right arm pain" (AR 453), his arm and neck pain were reduced, cervical imaging showed a successful fusion (*id.*); a lumbar spine (lower back) MRI showed only mild abnormalities; and a thoracic spine (upper and middle back) MRI showed no abnormalities (AR 425, 467). The only clinical findings during the relevant period indicated reduced range of motion, tenderness, and muscle spasms (AR 414, 416, 419–20, 423, 425, 453), nothing so extreme as Dr. Gibson opined in 2016 to require that Laviolette lay down for most of the day (AR 1129).[3] Moreover, much of these clinical findings were from before Laviolette's neck surgery, and at least three medical records indicate that Laviolette's neck pain was reduced after the surgery. (*Compare* AR 412 (presurgery August 2012 treatment note recording "significant[ly] decreased [range of motion of neck] in all directions") *with* AR 418 (postsurgery October 2012 treatment note recording "neck pain 'calmed down quite a bit'") *and* AR 422 (postsurgery November 2012 treatment note recording "[h]asn't had residual arm pain in 'some time'" and "[i]s able to move neck much more") *and* AR 423 (postsurgery November 2012 treatment note recording "no [neck] pain with [range of motion]").)

---

[3] Of note, several of Laviolette's treating providers, including Dr. Gibson herself, recommended that Laviolette try physical therapy, but after attending a couple sessions, Laviolette claimed it did not help much, or he was too busy, or he had no transportation. (AR 427, 438, 444–45, 447–49, 707, 725, 727 (November 2014 treatment note from Dr. Gibson, stating, "if he is unable to go to [physical therapy] over the course of this month[,] . . . I will start tapering his meds regardless of how he feels"), 973 (May 2015 treatment note from Dr. Gibson, stating, "need[s] to become more active, engage in formal [physical therapy], take some ownership in getting better"), 1015 (July 2015 treatment note from Dr. Gibson, stating, "[h]asn't gone to [physical therapy] for muscle strengthening/endurance (now no transportation, but didn't go even when had [it]"), 1050.)

13

Furthermore, the ALJ correctly noted that none of Laviolette's treating orthopedists, who specialize in neck issues, opined that Laviolette's neck pain was as severely limiting as Dr. Gibson, a general practitioner.[4] (AR 32.) Laviolette argues that Dr. Ryan Jewell, a treating neurosurgeon, opined that "it may be difficult for [Laviolette] to work in the future" (AR 373) (*see* Doc. 8 at 7–8), but that opinion was made in April 2012, before Laviolette's neck surgery. Laviolette also references the September 2012 opinion of Dr. Michael Barnum, a treating orthopedic surgeon, to support Dr. Gibson's opinions (*see* Doc. 8 at 8), but Dr. Barnum merely stated: "I do not think that [Laviolette] is ready to return to the work place *as of yet*" (AR 453), a clear reference to the fact that Laviolette was only one month postoperative.

Finally, the ALJ supported his decision to afford only limited weight to Dr. Gibson's 2015 and 2016 opinions by stating that those opinions are contradicted by the opinions of nonexamining agency consultants Dr. Cross and Dr. Cook, to which the ALJ afforded great weight. (AR 31–32.) In February 2015 and May 2015, respectively, Drs. Cross and Cook opined, based on their individual reviews of the record, that Laviolette could lift 20 pounds occasionally and 10 pounds frequently; stand/walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently climb ramps/stairs and ladders/ropes/scaffolds; frequently stoop, kneel, crouch, and crawl; balance (with no limitations); and

---

[4] In making this point, the ALJ erroneously stated that Laviolette's surgery occurred in February instead of August 2012. (AR 32.) Laviolette suggests this makes the entire finding unclear (Doc. 8 at 7), but I find it to be mere harmless error, particularly considering that the ALJ knew the surgery occurred in August 2012, as he explicitly referenced it earlier in the decision (*see* AR 30 ("[Laviolette] eventually required [neck] surgery in August 2012." (citations omitted))).

14

frequently reach and handle bilaterally. (AR 146–47, 883–84; *see* AR 128–29.) Laviolette argues that the ALJ did not provide any good reason for substituting the opinions of *nonexamining* consultants Drs. Cross and Cook for those of *treating* physician Dr. Gibson, and that the ALJ should not have given significant weight to the opinions of Drs. Cross and Cook. (Doc. 8 at 8.)

Preliminarily, there is some merit to Laviolette's assertion that the ALJ should not have given greater weight to the agency consultants' opinions on the grounds that the consultants, "unlike Dr. Gibson, have experience evaluating disability claims and familiarity with Social Security disability program rules and regulations."[5] (AR 32; *see* Doc. 8 at 8–9.) A reviewing source's familiarity with the regulations has little relevance to the issue of what physical and mental limitations a particular claimant had during the relevant period; and in fact, all else being equal, the regulations provide that the ALJ should "give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not." 20 C.F.R. § 404.1527(c)(1); *see id.* at § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

---

[5] *See also* AR 31 (ALJ giving "great weight" to the opinions of agency consultants Drs. Cross and Cook in part because they "are experienced in the evaluation of disability claims" and "have familiarity with Social Security disability program rules and regulations").

hospitalizations."). However, the regulations do provide that "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has" is a "relevant factor[] that [the Commissioner] will consider in deciding the weight to give to a medical opinion." *Id.* at § 404.1527(c)(6); *see Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016). Thus, the ALJ did not err in considering this factor in assessing the value of the agency consultants' opinions as compared to that of Dr. Gibson's opinions.

Furthermore, all else is not equal here, and the ALJ properly relied on other factors, particularly consistency and supportability, in affording more weight to the consultant opinions. (*See* AR 31–32; *see also* 20 C.F.R. § 404.1527(c)(3)–(4).) Specifically, the ALJ stated that the opinions of Drs. Cross and Cook were "supported [by] citations to specific evidence of record" and "consistent with other significant evidence of record," including: (a) November 2012 and December 2012 MRI findings indicating that Laviolette's thoracic and lumbar spine was largely normal, with only mild degeneration; (b) treatment notes from soon after Laviolette's August 2012 surgery indicating that he had significantly less arm pain; and (3) normal neurological assessments during the relevant period. (AR 31 (citing AR 415–16, 420, 425, 467).) Substantial evidence—cited in the ALJ's decision and discussed above—supports these findings.

Although, as noted above, the opinions of treating physicians are generally given more weight than those of nonexamining agency consultants, the regulations clearly permit the opinions of agency consultants to override those of treating physicians, when the former are more consistent with the record evidence than the

hospitalizations."). However, the regulations do provide that "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has" is a "relevant factor[] that [the Commissioner] will consider in deciding the weight to give to a medical opinion." *Id.* at § 404.1527(c)(6); *see Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016). Thus, the ALJ did not err in considering this factor in assessing the value of the agency consultants' opinions as compared to that of Dr. Gibson's opinions.

Furthermore, all else is not equal here, and the ALJ properly relied on other factors, particularly consistency and supportability, in affording more weight to the consultant opinions. (*See* AR 31–32; *see also* 20 C.F.R. § 404.1527(c)(3)–(4).) Specifically, the ALJ stated that the opinions of Drs. Cross and Cook were "supported [by] citations to specific evidence of record" and "consistent with other significant evidence of record," including: (a) November 2012 and December 2012 MRI findings indicating that Laviolette's thoracic and lumbar spine was largely normal, with only mild degeneration; (b) treatment notes from soon after Laviolette's August 2012 surgery indicating that he had significantly less arm pain; and (3) normal neurological assessments during the relevant period. (AR 31 (citing AR 415–16, 420, 425, 467).) Substantial evidence—cited in the ALJ's decision and discussed above—supports these findings.

Although, as noted above, the opinions of treating physicians are generally given more weight than those of nonexamining agency consultants, the regulations clearly permit the opinions of agency consultants to override those of treating physicians, when the former are more consistent with the record evidence than the

latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler*, 3 F.3d at 567–68 ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.")); *see also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). Here, the opinions of agency consultants Drs. Cross and Cook are more consistent with the record than those of treating primary care physician Dr. Gibson. Further, there is no orthopedist opinion assessing limitations more severe than those of Drs. Cross and Cook during the relevant period. Therefore, the ALJ was justified in affording great weight to the opinions of the consultants and little weight to those of Dr. Gibson. *See, e.g.*, *Camille*, 652 F. App'x at 28.

Laviolette argues that the ALJ's findings in favor of the opinions of the agency consultants and against Dr. Gibson improperly related only to Laviolette's back, when it was his neck that was "the crux of the matter." (Doc. 8 at 9.) This argument fails, as the ALJ explicitly cited to September 2012 and October 2012 treatment notes that included an assessment of Laviolette's neck. (*See* AR 31 (citing AR 416, 420); *see also* AR 419.) And, although the ALJ did not specifically cite to them, imaging results of Laviolette's neck from about one month after his neck surgery were normal. (*See* AR 453 (orthopedist Dr. Barnum reporting: "lateral x-rays of the cervical spine show intact anterior cervical plating, with no change in position, no signs of loosening, and intact intervertebral device").)

## Conclusion

For these reasons, the Court finds no error in the ALJ's analysis of Dr. Gibson's opinions, and thus DENIES Laviolette's motion (Doc. 8), GRANTS the Commissioner's motion (Doc. 11), and AFFIRMS the decision of the Commissioner. The Clerk shall enter judgment on behalf of the Commissioner.

Dated at Burlington, in the District of Vermont, this 27th day of September 2017.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge